**WESTINGHOUSE ELECTRIC CORPORATION, a Pennsylvania Corporation, Appellant,**

v.

**GRAND RIVER DAM AUTHORITY, Brown Boveri Corporation, a New York Corporation, and Benham-Holway Power Group, Appellees.**

No. 60102.

Supreme Court of Oklahoma.

May 13, 1986.

As Corrected May 21, 1986.

**714**

Wm. L. Peterson & Associates, Oklahoma City, and Wallace and Owens, Inc., Miami, for appellant.

Jones, Givens, Gotcher, Boyle & Bogan, Inc. by Deryl L. Gotcher, Graydon Dean Luthey, Jr., Vicki J. Vaniman, Tulsa, for appellee, Grand River Dam Authority.

Huffman Arrington Kihle, Gaberino & Dunn by John A. Gaberino, Jr., Larry D. Henry, Tulsa, Rorschach, Pitcher, Castor, & Hartley by Jack L. Rorschach, Vinita, for appellee Brown Boveri Corp.

Howard LaSorsa & Widdows by P. Gae LaSorsa, William G. LaSorsa, Tulsa, for appellee Benham-Holway Power Group.

KAUGER, Justice.

The question presented is whether the trial court properly denied the permanent injunction sought by Westinghouse Electric Corporation (WEC-appellant) to prevent the Grand River Dam Authority (GRDA) from awarding a contract for a generator to the Brown Boveri Corp. (BBC). WEC's failure to seek a temporary injunction before judgment was entered by the trial court pursuant to 12 O.S.1981 § 1382, or to stay the enforcement of the agency decision or the judgment of the district court under 75 O.S.1981 § 319 and 12 O.S.1981 §§ 968, 974, has permitted BBC substantially to complete Contract 2–R and has rendered the appeal moot. Under these circumstances, we have no choice but to dismiss this appeal.

WEC challenges the propriety of GRDA's conduct in relation to the bidding and evaluation of proposals submitted on Contract 2–R, and in the granting of the contract to BBC. WEC alleges that there was a conflict of interest on the part of several members of the GRDA's board of directors and staff, as well as among the employees of the Benham-Holway Power Group (B–HPG), the engineering firm hired to evaluate the bids on the contract. WEC asserted at trial, and on appeal, that in the course of the bidding period, GRDA members behaved unethically and violated several state statutes, including the Oklahoma Public Competitive Bidding Act,[1] The Code of Ethics for State Officials and Employees,[2] the Oklahoma Open Meeting Act[3] and the Oklahoma Buy American Act.[4]

A detailed explanation of the facts alleged would require a long and complicated narrative involving a variety of actions which took place over a period of more than five years; however, a slightly abbre-

---

1. Title 61 O.S.1981 §§ 101 et seq.

2. Title 74 O.S.1981 §§ 1401 et seq.

3. Title 25 O.S.1981 §§ 301 et seq.

4. Title 61 O.S.1981 § 51.

viated version of the facts will suffice to supply an adequate background.

In 1976, GRDA determined that the increased power needs of the surrounding community required the construction of a new power station, and it decided to build a coal-fired electric power generating station at Chouteau, Oklahoma. Bids were called for, and pursuant to 61 O.S.1981 § 101 et seq., the Public Competitive Bidding Act, GRDA selected WEC to supply the turbine generator, and Foster-Wheeler Corp. to furnish the station's boiler on Unit 1. In the spring of 1979, GRDA contacted B–HPG requesting a feasibility study to determine if a second coal-fired generating station should be constructed. In accordance with its general consulting contract with GRDA, B–HPG performed the study, and in May 1980, B–HPG presented its report to the Board recommending construction of a second unit at the Chouteau site.

In December of 1979, WEC escorted various GRDA Board and staff members on a three to five day tour of its plant and facilities in Pittsburgh and Philadelphia, Pennsylvania, and Winston-Salem and Charlotte, North Carolina. GRDA's representatives were flown to the east coast on WEC's executive jet and transported from place to place in a mobile home leased by WEC with all expenses being paid by WEC. [The GRDA members were not accompanied by their spouses on this trip.]

The Board of Directors of GRDA authorized construction of the second unit in September 1980, and the GRDA staff began planning and drafting specifications for Unit 2. Later that month, the staff mailed letters to national engineering firms soliciting bids for Unit 2. Responses were received from sixteen firms, and a special committee of the Board reduced this number to six viable candidates. The committee then interviewed the six firms, recommending three to the Board. These companies submitted bids for performing the engineering on Unit 2. In February 1981, the Board voted to award a variable fee engineering contract to B–HPG. The bonding authority for construction was approved by the State of Oklahoma in May of that year.

In February of 1981, several GRDA staff members and their spouses were invited to tour BBC's plant and facilities in Baden, Switzerland. This trip was also attended by the Chairman of the Board of GRDA, the President of B–HPG, and their wives. These guests were flown from Tulsa to London on a commercial airline, where they spent the night and attended a performance of the play "Oklahoma". The GRDA and B–HPG personnel and wives were then flown to Germany where they spent a few days touring BBC generating stations and sightseeing. They were transported by train to Baden, Switzerland, where they toured BBC's manufacturing plant. The plant tour took at least three days, and the trip lasted eight or nine days. All expenses were paid by BBC.

In April, 1981, GRDA notified the equipment vendors, who had indicated an interest in Unit 2, of its intent to proceed with the project, requesting comments on the preliminary specifications proposed for the unit's turbine generator. These comments were received later that month and evaluated by the GRDA staff and B–HPG. In May 1981, GRDA hired a second engineering firm, R.W. Beck Associates (BECK), on a fixed rate contract to perform an additional evaluation of the expected bid proposals.

In May of 1981, the GRDA requested bids on delivery of a turbine generator for Unit 2. Shortly thereafter, WEC began sending GRDA Board and staff members, and B–HPG evaluating engineers letters, and pieces of a checkerboard set as part of their "Buy American" campaign. The checkerboards bearing the WEC logo were distributed a few parts at a time until about June 15, 1981. On June 2, 1981, the sealed bids on Contract 2 were received by the GRDA, which were opened and publicly read aloud in the presence of a GRDA administrative officer. On June 6, BECK submitted its evaluation of the bids on Contract 2 to GRDA's general manager. BECK announced BBC to be the low evalu-

716

ated bidder, and on July 7, B–HPG submitted its findings reaching the same conclusion.

On July 13, a WEC representative contacted the GRDA vice-chairman requesting a re-bid of Contract 2. On July 15, 1981, the Board met and decided to award the Unit 2 boiler contract to Foster-Wheeler Corp. At this meeting, the Board also voted *not to award* Contract 2, but to re-bid the contract. On July 23, B–HPG met with each bidder, debriefed them on the bids, and advised them of evaluation criteria.

On July 29, the turbine contract, designated Contract 2–R, was readvertised. On August 22, 1981, sealed bids were received, opened, and publicly read in the presence of a GRDA administrative officer. In early September, B–HPG and BECK provided the GRDA with evaluations of the bids. Again, both firms evaluated BBC as the lowest bidder on Contract 2–R. WEC's actual bid was $26,120,945.00 a little less than $1,000,000.00 under BBC's offer but after the bids were evaluated, it was determined that WEC's bid was actually 21 to 24% higher than BBC's bid. On September 16, 1981, the Board voted to award the contract to BBC, and on October 2, a purchase contract was executed.

On October 12, 1981, WEC filed an action seeking permanently to enjoin the awarding of Contract 2–R to BBC. The case was tried from January 10 to January 18, 1983, and February 7 to February 16, 1983. The district court refused to grant a permanent injunction and WEC appealed. On May 13, 1983, the appellees responded to WEC's petition-in-error and moved for a dismissal

of the appeal because of mootness. On June 20, 1983, this motion was denied without prejudice to reargument of the mootness issue. In February, 1984, BBC delivered the turbine generator to GRDA. It has been installed in Unit 2. On August 15, 1984, the appellees again filed a motion to dismiss because of mootness; WEC's response was filed October 29, 1984.

I

THE CONDUCT OF MEMBERS AND STAFFS OF GOVERNMENTAL AGENCIES IS REGULATED BY STATUTE

The trial court found that the inspection trips sponsored and paid for by WEC and BBC were merely advertising and that they served a valuable purpose not only for the manufacturer but also for GRDA. Although we are required to find that the appeal is technically moot, we are not prevented from discussing the standards of conduct prescribed by law for those who are entrusted with the public pursestrings.

The GRDA is not a private industry—it is a governmental agency of the State of Oklahoma created by the legislature.[5] As such, the conduct of its Board and staff members must comply with 74 O.S.1981 § 1401 et seq., the Code of Ethics for State Officials and Employees, (now 74 O.S.Supp. 1982 § 841.5, the Oklahoma Personnel Act). The public policy of the state is that no state officer or employee may engage in any transaction which is in substantial conflict with the proper discharge of public duties or the public interest.[6] Section 1404

5. *See, Sheldon v. Grand River Dam Authority,* 182 Okl. 24, 76 P.2d 355, 361 (1938); 82 O.S. 1981 § 861 et seq.

6. Title 74 O.S.1981 § 1402 provided:
"It is hereby declared to be the policy of the State of Oklahoma that no officer or employee or member of the executive, judicial or legislative branch of state government shall have any interest. financial or otherwise, or engage in any business or transaction of any nature which is in substantial conflict with the proper discharge of his public duties or with the public interest. To protect the public from improper use of authority and to protect

public officials and employees from unwarranted assaults on their integrity, the following code of ethics for state government is hereby adopted."
This was repealed and the new provision, 74 O.S.Supp.1982 § 841.5, states:
"No state agency shall:
1. Enter into any contract with an employee of the agency, or with a business in which an employee holds a substantial financial interest, unless the contract is made after public notice by the agency and compliance with competitive bidding procedures. This paragraph shall not apply to a contract of employment with the state:
 ...."

of the Code precluded any state employee from directly or indirectly soliciting or accepting any compensation, *gift,* loan, *entertainment, favor* or service given for the purpose of influencing the employee in the discharge of his official duties.[7] So does 74 O.S.Supp.1982 § 841.4. The alleged misbehavior may or may not be actionable pursuant to 21 O.S.1981 § 381[8] or under the penal sanctions imposed by the Oklahoma Personnel Act, 74 O.S.Supp.1982 § 841.23 (effective July 1, 1982).[9] That question is not before us.

It is certainly debatable whether BBC's all-expense paid trip to Europe for the spouses of GRDA members, as well as tickets to a play, were given for the purpose of influencing the members' decisions, but we doubt if such behavior is truly in accord with legislative policy. Acceptance of these gratuities appears to violate the spirit, if not the letter of the law. It may be true that these activities are standard operating procedure in private industry; this Court, however, does not condone such practices in the area of public contracting. WEC asserts that its gifts of checkerboard sets and model trains, and the alleged provision of World Series tickets are just "advertising", but we doubt very much whether the equity jurisdiction of our courts can be used to protest the fact that another bidder has been more successful with its "advertising" campaign. One must first do equity before one can seek equity.[10]

We do not intend to condemn GRDA's members for taking the time to tour the bidders' facilities in order to insure that these vendors could deliver as promised. These trips appear to be a key function and a necessary precaution for protecting the public trust. We do protest the use of such functions to extend benefits and gratuities to state employees and their families. Government agencies are uniquely endowed with the power to implement the public will, and as such, are subject to the highest levels of scrutiny by the people whom they serve. Government officials and employees must exercise great care to

7. Title 74 O.S.1981 § 1404 provided:
   "No state employee shall:
   (a) Directly, or indirectly solicit or accept any compensation, gift, loan, entertainment, favor or service given for the purpose of influencing such employee in the discharge of his official duties. Provided, however, that this section shall not apply to a bona fide campaign contributions:
   ...."

   The new provision 74 O.S.Supp.1982 § 841.4, states:
   "No state employee shall:
   1. Directly or indirectly solicit or accept any compensation, gift, loan, entertainment, favor or service given for the purpose of influencing such employee in the discharge of his official duties. Provided, however, that this section shall not apply to bona fide campaign contributions;
   ...."

8. Title 21 O.S.1981 § 381 provides in pertinent part:
   "Whoever corruptly gives, offers, or promises to ... employee of the State of Oklahoma ... any gift or gratuity whatever, with intent to influence his act, vote, opinion, decision, or judgment on any matter, question, cause, or proceeding which then may be pending, or may by law come or be brought before him in his official capacity, or as a consideration for any speech, work, or service in connection therewith, shall be punished by imprisonment in the State Penitentiary not exceeding five (5) years, or by a fine not exceeding Three Thousand Dollars ($3,000.00) and imprisonment in jail not exceeding one (1) year."

9. Title 74 O.S.Supp.1982 § 841.23 provides:
   "A. Any person who willfully violates any provision of the Oklahoma Personnel Act or of any rule or regulation adopted pursuant to the authority herein granted shall be guilty of a misdemeanor and upon conviction thereof shall be punished by a fine of not less than Fifty Dollars ($50.00) nor more than One Thousand Dollars ($1,000.00), or by imprisonment for not longer than six (6) months, or by both such fine and imprisonment.
   B. Any person who is convicted of a misdemeanor under the provisions of the Oklahoma Personnel Act shall, for a period of five (5) years, be ineligible for appointment to or employment in a position in state service and, if at the time of conviction he or she is an employee of the state, shall forfeit his or her position."

10. *Story v. Hefner,* 540 P.2d 562, 567 (Okla. 1975), *Iven v. Roder,* 431 P.2d 321, 327 (Okla. 1967); *Pope v. Vernon,* 383 P.2d 9, 13 (Okla. 1963), *Eudaly v. Superior Oil Co.,* 270 P.2d 335, 340 (Okla.1954), *Shell Oil Co. v. Howell,* 208 Okl. 598, 258 P.2d 661, 665 (1953).

avoid even the appearance of impropriety in their duties; for they, like Caesar's wife, must be above reproach.

## II

## IF THE ACTION SOUGHT TO BE ENJOINED HAS BEEN PERFORMED AND NO PARTICULAR RELIEF CAN BE OFFERED, THE ISSUES ARE HYPOTHETICAL, THE CASE BECOMES MOOT AND THEREFORE MUST BE DISMISSED

WEC seeks to have this Court prevent the awarding of a contract which has been substantially completed. Under its pleadings the only relief sought is a permanent injunction against GRDA and BBC. This Court cannot prevent what has already taken place, and we cannot envision any order we might issue which would grant WEC the relief it seeks this late in the proceedings. If the action sought to be enjoined

has been performed and no particular relief can be afforded, the issues in this Court are abstract and hypothetical and the case becomes moot. Under such circumstances, the appeal should be dismissed.[11]

WEC did not apply for a stay of GRDA's order awarding the contract to BBC pursuant to 75 O.S.1981 § 319;[12] nor did WEC seek a temporary injunction to prevent the parties from taking any action on Contract 2–R to maintain the status quo while it filed its action for a permanent injunction in district court in 1981. Title 12 O.S.1981 § 1382[13] authorizes a district court to issue temporary injunctions and restraining orders to achieve precisely that result. In addition to these pre-judgment remedies, WEC failed to request a post-judgment stay under 12 O.S.1981 §§ 968, 974 which provide for stays of the execution of judgments during the pendency of an appeal, to preserve the controversy, even after a trial on the merits.[14] Instead of taking advan-

---

**11.** In *Trader's Compress Co. v. Board of Review, Oklahoma Employment Security Commission,* 203 Okl. 564, 224 P.2d 268 (1950) we recognized that this Court is not authorized to render "advisory opinions" and interpreted this restriction to mean that:

> [the] Supreme court will not attempt to determine abstract, hypothetical, or moot questions, but where it is made to appear that the questions brought up for review have become moot, proceedings will be dismissed.

*Resler v. Green,* 177 Okl. 499, 61 P.2d 191 (1936), citing, *Swindall v. State Election Board,* 96 Okl. 40, 219 P. 942–43 (1923).

**12.** Title 75 O.S.1981 § 319 provides:

> "Staying enforcement of agency decision pending review
> (1) The filing of a proceeding for review shall not stay enforcement of the agency decision; but the agency may do so, or the reviewing court may order a stay upon such terms as it deems proper, and shall do so whenever required by subsection (2) of this section.
> (2) In every proceeding in any court for the review of an order of an agency, upon the filing of an application, supported by verified statements of material fact establishing that the enforcement of the order pending final decision would result in present, continuous and irreparable impairment of the constitutional rights of the applicant, a stay of the enforcement of such order and of the accrual of penalties thereunder shall be entered upon the condition that:

> (a) injury to adverse parties or to the public, as the case may be, can be obviated through the furnishing of security adequate to compensate for any loss which may be suffered as a result of the stay in the event the order is affirmed, in whole or in part; ...."

**13.** Title 12 O.S.1981 § 1382 provides in pertinent part:

> "Cause for injunction—Temporary, injunction When it appears, by the petition, that the plaintiff is entitled to the relief demanded, and such relief, or any part thereof, consists in restraining the commission or continuance of some act, the commission or continuance of which, during the litigation, would produce injury to the plaintiff; or when, during the litigation, it appears that the defendant is doing, or threatens, or is about to do or is procuring or suffering to be done, some act in violation of the plaintiff's rights respecting the subject of the action, and tending to render the judgment ineffectual, a temporary injunction may be granted to restrain such act."

**14.** Title 12 O.S.1981 § 968 provides, in pertinent part:

> "No proceeding to reverse, vacate or modify any judgment or final order rendered in the district court, except as provided in the next section, and the fourth subdivision of this section, and except proceedings to reverse, vacate or modify any judgment or final order rendered in district court against any county, municipality or other political subdivision of the State of Oklahoma, shall operate to stay

tage of these pre-judgment and post-judgment remedies, WEC chose to ignore them and permitted BBC to continue to perform under the contract.

WEC admits that it chose not to seek any order restraining the appellees from completing the contract. WEC has also admitted that if such a request had been made, "WEC would not have been acting in good faith because it could not under bid BBC at a rebid...."[15] However, WEC still urges this Court to ignore the fact that the contract has been substantially completed and reach the merits. WEC asserts that because their allegations touch upon the proper application of the Competitive Bidding Act, Open Meeting Act, the Code of Ethics of Public Employees and the Buy American Act, there are issues of vital public interest at stake in this action and dismissal would be improper.

WEC contends that GRDA violated the Public Competitive Bidding Act, the Open Meeting Law and Buy American Act. Specifically, it alleges that the change order should have been subjected to competitive bidding. This argument is premised on an inaccurate analysis of 61 O.S.1981 § 121[16] which allows change orders, without readvertisement for bids, if the order does not exceed 10% of the cumulative total of the original amount of the contract—it did not. WEC alleges that the contract was discussed in executive session in violation of the Open Meeting Act, 25 O.S.1981 § 307.[17] Apparently, there was discussion of the contract. One member of the Board inquired concerning how high interest rates would affect GRDA's funding, and another member announced that he would vote against the turbine generator Contract, 2–R. No action or vote was taken and the session was adjourned; all action and votes taken were conducted in an open meeting. WEC also asserts that the Buy American Act, 61 O.S.1981 § 51[18] was violated. The

execution, unless the clerk of the court in which such judgment or final order shall have been rendered, shall take a written undertaking, to be executed on the part of the plaintiff in error, to the adverse party, with one or more sufficient sureties...."

Title 12 O.S.1981 § 974 provides:
"Execution of the judgment or final order of any judicial tribunal, other than those enumerated in this article, may be stayed on such terms as may be prescribed by the court or judge thereof, in which the proceedings in error are pending, except that execution of a judgment or final order of any judicial tribunal against any county, municipality, or other political subdivision of the State of Oklahoma is automatically stayed without execution of supersedeas bond until appeal has finally been determined."

15. Appellant's Response to Joint Motion of Appellees to Dismiss Appeal Based on Mootness, filed 10–29–84, p. 3.

16. Title 61 O.S.1981 § 121 provides in part:
"Change orders or addendums to public construction contracts of One Million Dollars ($1,000,000.00) or less shall not exceed fifteen percent (15%) cumulative total of the original contract amount. Change orders or addendums to public construction contracts of over One Million Dollars ($1,000,000.00) shall not exceed ten percent (10%) cumulative total of the original contract amount. Any change orders or cumulative change orders which

exceed these limits shall require a readvertising for bids on that part of the contract...."

17. Title 25 O.S.1981 § 307 provides in part:
"No public body shall hold executive sessions unless otherwise specifically provided for herein.
Executive sessions of public bodies will be permitted only for the purpose of discussing the employment, hiring, appointment, promotion, demotion, disciplining or resignation of any individual salaried public officer or employee; or by district boards of education for the purpose of hearing evidence and discussing the expulsion or suspension of a student when requested by the student involved or his parent, attorney or legal guardian and for the purpose of discussing negotiations concerning employees and representatives of employee groups. Provided, however, that any vote or action thereon must be taken in public meeting with the vote of each member publicly cast and recorded ..."

18. Title 61 O.S.1981 § 51 provides in pertinent part:
"All agencies, boards, commissions, offices, institutions, or other governmental bodies of the State of Oklahoma, and all individuals making purchases on behalf of such governmental bodies, shall purchase for such governmental bodies goods and equipment manufactured or produced in the United States of America, unless a foreign made product is substantially cheaper and of equal quality, or is of substantially superior quality to compet-

generator offered by BBC met the statutory requirement of being substantially cheaper and of equal quality to the competing American product. GRDA substantially complied with the three Acts.

■ Although we recognize the public interest exception to the mootness doctrine,[19] it is inapplicable here. While it is true that violations of statutes such as those cited may have a substantial impact upon vital public interests, not every *alleged* violation is sufficient in magnitude to preserve the controversy for review. In *Skouby v. Board of Education of School District No. 60*, 143 Okl. 272, 288 P. 461–62 (1930), this Court held moot a case challenging the award of a contract to build a school despite a claim that the contract was illegal and void because the school board did not permit competitive bidding. In *Rogers v. Excise Board of Greer County*, 701 P.2d 754, 760 (Okla.1984), the fact that the Board conducted business injurious to the plaintiff in violation of the Open Meeting Act was not sufficient in itself to preserve the issues. The matter was rendered moot for review on the merits. Given that WEC has failed to demonstrate that a different result would have been obtained or any substantial public interest in having Contract 2–R rebid, other than to have this Court issue an advisory opinion concerning proper conduct for GRDA, we find no reason to invoke the exception in this case.

Not every decision by a government agency impacts on vital public interest.[20]

In *J.R. Francis Construction Co. v. Pima County*, 1 Ariz.App. 429, 403 P.2d 934 (1965), the Arizona Court of Appeals was presented with an analagous situation. Francis submitted the low dollar bid to the county in response to its request for contractors to build a new jail, but the contract was awarded to a competitor. Francis brought suit alleging a violation of Ariz. Rev.Stat.Ann. § 34–241 (1939), a competitive bidding statute, and seeking an injunction to compel the county to award it the contract. The trial court denied the injunction, and Francis appealed.

Like Oklahoma, Arizona provides various temporary remedies to prevent performance of acts which detrimentally affect the ability to seek redress on appeal. The applicable Arizona statute, Ariz.Rev.Stat. Ann., Rules of Civil Procedure, Rule 62(c) (1973), provides that an appellant may seek a stay of the trial court's judgment while an appeal is pending and thus preserve the controversy.[21] Francis chose to ignore this provision, and appealed without seeking a stay of the trial court's order. As a result, the competitor fulfilled its contract with the county before the appeal could be decided. Faced with these circumstances, the court declared the case moot, and dismissed the appeal.[22]

---

ing American products and is sold at a comparable price."

**19.** *Lawrence v. Cleveland County Home Loan Authority*, 626 P.2d 314, 316 (Okla.1981); *see also*, *Peppers Refining Co. v. Corporation Commission*, 198 Okl. 451, 179 P.2d 899 (1947); *Payne v. Jones*, 193 Okl. 609, 146 P.2d 113 (1944).

**20.** See, *Lawrence v. Cleveland County Home Loan Authority*, supra, note 19.

**21.** Arizona's method for staying the effects of a judgment during the pendency of an appeal is found in Ariz.Rev.Stat.Ann., Rules of Civil Procedure, Rule 62(c), (1973), provides, in part: 62(c) "Injunction pending appeal. When an appeal is taken from an interlocutory or final judgment granting, dissolving, or denying an injunction, the court in its discretion may suspend, modify, restore, or grant an injunction during the pendency of the appeal upon

such terms as to bond or otherwise as it considers proper for the security of the rights of the adverse party."

**22.** *J.R. Francis Const. Co. v. Pima County*, 1 Ariz.App. 429, 403 P.2d 934–35 (1965). This decision was cited with approval of the Supreme Court of Maine *Hazzard v. Westview Golf Club, Inc.*, 217 A.2d 217, 224–25 (Me.1966), when it held:

"The mere filing of an appeal, in the absence of a stay of proceedings, cannot operate as an injunction or stay where none has been granted by the court below. An appeal from a decree dismissing a complaint seeking an injunction, or refusing to grant an injunction, or dissolving an injunction, will not disturb the operative effect of such a decree, and where the act sought to be restrained has been performed, the appellate courts will deny review on the ground of mootness.

We are in total agreement with the Arizona court's analysis. If a person seeking injunctive relief does not take advantage of the procedures available for preserving the status quo, and the conduct which is sought to be prevented is thus permitted to take place, we cannot provide any relief. WEC did nothing to stop GRDA or BBC from completing Contract 2–R while this appeal was pending. As a result, the contract has been substantially completed. When an act which is sought to be enjoined has been already performed, or can never be performed, the appeal is moot.[23] Under such circumstances, a long line of legal precedent dictates dismissal of the appeal.[24]

APPEAL DISMISSED.

DOOLIN, V.C.J., and LAVENDER, WILSON and SUMMERS, JJ., concur.

SIMMS, C.J., concurs in result.

HODGES, HARGRAVE and OPALA, JJ., concur in judgment only.

OPALA, Justice, with whom HODGES and HARGRAVE, JJ., join, concurring in judgment.

While I join the court's dismissal of this appeal for mootness, I must recede from its gratuitous comments on the clouded behavior of functionaries whose past official actions escape today our adjudicative scrutiny. Judicial institutions do not remain true to their constitutionally-mandated posture of *absolute* detachment and neutrality when they cast themselves, however slightly, obliquely or inadvertently, in the role of enforcers. The responsibility for generating a community climate favorable to charging public officers with disciplinary,

civil or criminal transgressions is not reposed in this court.

....' "

23. *Wolfe v. Hart's Bakeries, Inc.,* 460 P.2d 950, 952 (Okla.1969); *See also, Post v. Kingdom Hall of Jehovah's Witnesses,* 283 P.2d 528–29 (Okla. 1955), *Duncan v. Sims,* 277 P.2d 145–46 (Okla. 1954).

24. *Hamilton v. Investment Towers Corp.,* 489 P.2d 488 (Okla.1971); *Post v. Kingdom Hall of Jehovah's Witnesses,* see note 23, supra; *Whittington v. City of Ardmore,* 181 Okl. 286, 73 P.2d 413–14 (1937); *Beveridge v. Fairfax Oil Corp.,*

178 Okl. 379, 62 P.2d 1171 (1936); *Reinhart & Donovan Co. v. Refiners' Production Co.,* 175 Okl. 522, 53 P.2d 1116–17 (1936); *Westgate Oil Co. v. Refiners Production Co.,* 172 Okl. 260, 44 P.2d 993–94 (1935). *See, Bruce E. Cohan M.D. v. Riverside Park Place,* 140 Mich.App. 564, 365 N.W.2d 201, 203 (1985); *Montana Power Co. v. Charter,* 173 Mont. 429, 568 P.2d 118–19 (1976); *Tri-State Const. Co. v. City of Seattle,* 14 Wash. App. 476, 543 P.2d 353, 355 (1975); *Connell v. Reno Const. Co.,* 192 Kan. 368, 388 P.2d 830 (1964).